## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| KELLY EASTER<br>610 S. 14th St.<br>Nashville, TN 37206,<br><div align="right">*Plaintiff,*</div><br><div align="center">v.</div><br>UNITED STATES DEPARTMENT OF<br>HEALTH AND HUMAN SERVICES,<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201;<br><br>XAVIER BECERRA, in his official<br>capacity as Secretary of the UNITED<br>STATES DEPARTMENT OF HEALTH<br>AND HUMAN SERVICES,<br>200 Independence Avenue, S.W.,<br>Washington, D.C. 20201;<br><br>ADMINISTRATION FOR CHILDREN<br>AND FAMILIES,<br>330 C Street, S.W.,<br>Washington, D.C. 20201;<br><br>JOOYEUN CHANG, in her official<br>capacity as Acting Assistant Secretary for<br>the ADMINISTRATION FOR<br>CHILDREN AND FAMILIES,<br>330 C Street, S.W.,<br>Washington, D.C. 20201;<br><br>OFFICE OF REFUGEE<br>RESETTLEMENT,<br>330 C Street, S.W.,<br>Washington, D.C. 20201; and<br><br>CINDY HUANG, in her official capacity<br>as Director of the OFFICE OF<br>REFUGEE RESETTLEMENT,<br>330 C Street, S.W.,<br>Washington, D.C. 20201,<br><br><div align="right">*Defendants.*</div> | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. _____<br><br>COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF |

## **Introduction**

1.      Each year, tens of thousands of refugee children who have no lawful immigration status in the United States are referred to the Office of Refugee Resettlement within the U.S. Department of Health and Human Services to provide for their care and physical custody, as well as to find suitable sponsors (i.e., parents, guardians, relatives, or individuals designated by the child's parents) for them. To meet this uniquely governmental obligation, the federal government turns to outside organizations for taxpayer-funded services—including placing these children with suitable foster parents in the interim—to ensure that the best interests of the children are met.

2.      Some of these organizations, however, provide taxpayer-funded foster-placement services on the federal government's behalf in a discriminatory manner that categorically excludes lesbian, gay, and bisexual people from participating as prospective foster parents. They contend that the organizations' religious beliefs justify denying lesbian, gay, and bisexual people from participating equally in the government program that the agencies receive taxpayer funds to administer. Plaintiff Kelly Easter is one of the many people who are subjected to the sting of discrimination and deprived of the opportunity to participate in a federal program for refugee children on the same terms as other prospective foster parents.

3.      The United States Constitution constrains the government by requiring freedom without favor and equality without exception in performing its functions. And what the government cannot do directly, it may not do indirectly. Thus, Kelly

Easter brings this suit to seek declaratory and injunctive relief against the federal officials responsible for sanctioning and ratifying unlawful discrimination in the administration of the government's Unaccompanied Children (UC) Program.

## Jurisdiction and Venue

4.     This case arises under the Constitution of the United States and presents federal questions within this Court's jurisdiction pursuant to 28 U.S.C. § 1331.

5.     This Court has jurisdiction to grant the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, Federal Rules of Civil Procedure 57 and 65, and the inherent equitable powers of the Court.

6.     Venue is proper in this District:

- pursuant to 28 U.S.C. § 1391(e)(1), because Defendants are officers or employees of an agency of the United States in their official capacities, or agencies of the United States;

- pursuant to 28 U.S.C. § 1391(e)(1), an action can be brought in any judicial district in which any defendant in the action resides, and (at a minimum) the defendant federal agencies reside in the District of Columbia, and

- pursuant to 28 U.S.C. § 1391(e)(1), an action can be brought in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, and here Defendants carry out a continuous and systematic portion of their business in this District, including where the unlawful administration of federal funds by Defendants.

2

## Parties

7.      **Plaintiff Kelly Easter** is a resident of Nashville, Tennessee and a federal taxpayer. Kelly has attempted to apply to be a foster parent for a child or children in a federally funded child-welfare program. But because she is a lesbian, she has not been permitted to do so on the same terms as a non-gay person because the program is administered in a discriminatory manner, based on certain religious beliefs to which she does not subscribe and that fail to serve the best interests of children.

8.      Kelly suffered the harms alleged in this Complaint when organizations receiving federal funds to administer one or more federal programs denied her equal opportunity to be a foster parent based on the organizations' religious beliefs regarding her sexual orientation and sex. Defendants enabled such discrimination against Kelly, and they failed to implement adequate safeguards to prevent such discrimination.

9.      Kelly brings suit against **Defendant United States Department of Health and Human Services ("HHS")**, which is headquartered in the District of Columbia, and is charged with enhancing and protecting Americans' health and well-being via the provision of health and human services. HHS is the federal agency that is responsible for overseeing the Office of Refugee Resettlement's functions and responsibilities involving the care and custody of children under the UC Program (Unaccompanied Children Program).

10.     Kelly brings suit against **Defendant Xavier Becerra** in his official capacity as Secretary of the United States Department of Health and Human Services. In that capacity, Defendant Becerra oversees the HHS.

11.     Kelly brings suit against **Defendant Administration for Children and Families ("ACF")**, which is headquartered in the District of Columbia, and is the operational division of HHS that is responsible for implementing certain human services programs, including those focused on fostering the economic and social welfare of children and families, such as the UC Program administered by the Office of Refugee Resettlement.

12.     Kelly brings suit against **Defendant JooYeun Chang** in her official capacity as Acting Assistant Secretary for ACF. In that capacity, Defendant Chang oversees the ACF.

13.     Kelly brings suit against **Defendant Office of Refugee Resettlement ("ORR")**, which is headquartered in the District of Columbia, and is the office within ACF that is responsible for the care and custody of children in the UC Program.

14.     Kelly brings suit against **Defendant Cindy Huang** in her official capacity as Director of the ORR. In that capacity, Defendant Huang oversees the ORR.

## **Factual Allegations**

*The Unaccompanied Children Program*

15.     The federal government currently cares for thousands of unaccompanied refugee children, many of whom are fleeing violence.

4

16.     When a child apprehended by a federal agency is under the age of 18, has no available parent or legal guardian in the United States to provide care and custody, and has no lawful immigration status, the child is transferred to the care and custody of ORR while awaiting immigration proceedings.

17.     Unaccompanied children have many reasons for undertaking the difficult journey of traveling to the United States, which may include rejoining family already here, escaping violent communities or abusive family relationships in their home countries, or finding work to support their families. Because of their age, their separation from parents and relatives, and the hazardous journeys they often take, unaccompanied children are vulnerable to human trafficking, exploitation, and abuse.

18.     ORR exercises a uniquely federal governmental function by placing unaccompanied children in the least restrictive setting that is in the best interests of the child, taking into consideration danger to self, danger to the community, and risk of flight. ORR is responsible for considering each child's unique situation and incorporating child-welfare principles when making placement, clinical, case-management, and release decisions that are in the best interest of the child. ORR's responsibilities under the UC Program include awarding and administering grants to and entering into cooperative agreements with child-welfare organizations to perform child-welfare services on ORR's behalf and ensuring that these organizations abide by applicable federal laws in providing the federally funded services.

19.     Through grants to and cooperative agreements with child-welfare organizations, ORR provides services to the children in its custody, including shelter, foster care, and residential placement. ORR is charged with guaranteeing that the best interests of the children are paramount in implementing its child-welfare programs. The child-welfare organizations are charged with, among other things, matching children in their care with qualified families in accordance with ORR's standards of care.

20.     Religiously affiliated organizations are among the providers of federally funded care for children under the UC Program. Although the organizations that receive federal grants and enter cooperative agreements under this program may be faith-based organizations, they may not use federal funds to proselytize or for other religious purposes, such as restricting access to federally funded child-welfare services based on faith-based principles.

21.     ORR has an obligation to ensure that the organizations that receive grants or enter cooperative agreements to provide federal child-welfare services relating to unaccompanied refugee children in its custody do so without discriminating against foster-parent applicants based on their sexual orientation, their sex, or the religious beliefs of the organizations.

22.     There are more children in the care of Defendants under the UC Program than there are eligible foster homes available for placement of such children.

23.     There is no valid reason for the government, or child-welfare organizations, to prefer heterosexual people over LGBTQ people when considering or

6

approving would-be foster parents or making placement decisions. The scientific community has reached consensus that children reared by lesbian, gay, or bisexual parents are just as likely to be well-adjusted as children of heterosexual parents. This consensus has been recognized by every major professional organization dedicated to children's health and welfare, including: the American Academy of Pediatrics, the American Psychological Association, the American Medical Association, the National Association of Social Workers, and the Child Welfare League of America. There is no basis in social science or child-welfare principles for categorically barring LGBTQ people from being foster parents.

24.    Excluding capable prospective foster parents because of their sexual orientation and sex is contrary to well-established professional child-welfare standards. Those standards seek to maximize the number of placement options for vulnerable children, focus exclusively on ensuring that placements serve the children's best interests, and concentrate on a prospective foster parent's capacity to meet the needs of the children.

25.    When Defendants enable organizations to turn away or establish qualifications that limit the pool of foster-parent applicants based on criteria generally unrelated to child welfare—such as an applicant's sexual orientation and sex, or the religious beliefs of the organizations—the number of potential homes for children is reduced.

26.    These sorts of invidious exclusions that reduce the number of placement options for children in this way cause harm to children in ORR's custody and care by

increasing the chances they will remain in group homes or shelters and decreasing the chances that those children will be placed in a nurturing home, thereby also increasing the risk that they will experience long-term adjustment difficulties.

27.    Exclusions that reduce the number of placement options for children may also result in placing children with less suitable parents who are unable to meet the children's individualized needs, causing harm to children in ORR's custody and care.

28.    Excluding prospective foster parents who may identify as LGBTQ, for example, may specifically cause harm to some LGBTQ children in ORR's custody and care. For these children, foster parents who share their identity may be a preferred placement. These children also may be stigmatized and hurt by learning that the very organizations responsible for their welfare would deem them to be unsuitable foster parents when they grow up.

29.    When Defendants enable organizations to turn away or establish different procedures for qualified foster-parent applicants based on the applicant's sexual orientation and sex, or the religious beliefs of the organizations themselves, it deters LGBTQ people from participating in the child-welfare system as a whole because of fear of further discrimination. This, in turn, further reduces placement options for children in need of foster parents.

30.    These exclusions, and especially, as here, the direct experience of being rejected based solely on sexual orientation and sex, may prevent LGBTQ people from participating in the child-welfare system entirely, even if other agencies might

potentially be willing to work with them. For example, other agencies may be too far away or may not otherwise be appropriate for the prospective foster parent's circumstances.

*United States Conference of Catholic Bishops*

31.    To fulfill their responsibilities under the UC Program, the Defendants engage child-welfare organizations that operate under cooperative agreements, grants, and contracts funded by federal taxpayers. The United States Conference of Catholic Bishops ("USCCB") and its subgrantees are among those who provide such federal child-welfare services for unaccompanied refugee children in the Nashville area under the UC Program.

32.    As a grantee of ORR, USCCB is charged with determining placements for children under the UC Program, among other responsibilities.

33.    USCCB receives millions of dollars in grants from ORR annually under the UC Program. ORR authorizes USCCB to use those funds to award subgrants to other organizations, including its subgrantee Bethany Christian Services ("Bethany"), to perform services for children in the Nashville area under the UC Program.

34.    Until very recently, USCCB was the sole or primary source of funding for Bethany's services for children under the UC Program.

35.    USCCB and its subgrantees apply their own religious criteria in providing these federally funded governmental services when accepting applications

from prospective foster parents, including religious requirements that discriminate against prospective foster parents on account of their sexual orientation and sex.

36.     Upon information and belief, in its UC grant application for the relevant period, USCCB informed ORR that USCCB will ensure that services provided under this application are not contrary to the authentic teaching of the Catholic Church, its moral convictions, and religious beliefs.

37.     Upon information and belief, USCCB also notified ORR in its UC grant application that it would require subgrantees to ensure that services provided to those served under its agreement are not contrary to the authentic teaching of the Catholic Church, its moral convictions, and religious beliefs.

38.     When ORR awarded the UC grants to USCCB for the relevant period, it did not prohibit USCCB from administering the grants based on religious considerations as set forth in USCCB's grant applications that would discriminate against applicants on the basis of sexual orientation or sex. Nor did ORR implement any other safeguards to prevent USCCB from discriminating on the basis of sexual orientation or sex.

39.     USCCB's UC grant applications for prior periods contained similar statements of intent with respect to religiously motivated administration of the grants, and ORR similarly did not implement adequate safeguards to prevent USCCB from limiting the program to serving what USCCB determined to be Catholic religious doctrine.

40.    In numerous contexts, USCCB publicly advocates against parenting of children by same-sex couples. For example, USCCB Fact Sheets concerning adoption and foster-care services, which have appeared on USCCB's website since at least 2013, state that, "[w]hen placing children with couples, Catholic Charities ensures those children enjoy the advantage of having a mother and a father who are married." *Discrimination Against Catholic Adoption Services*, USCCB, https://bit.ly/2YFWwuy (last visited September 28, 2021).

41.    Another section on USCCB's website entitled "Frequently Asked Questions About the Defense of Marriage" states, and stated at all times during the relevant period, that "[p]lacing a child in the care of two men or two women may be well-intentioned, but ultimately deprives the child of that which best serves his or her interests—a mother and a father." *Frequently Asked Questions About the Defense of Marriage*, USCCB, https://bit.ly/3DyeDlf (last visited September 28, 2021).

42.    Upon information and belief, USCCB has lobbied for the passage of laws that would allow child-welfare organizations that receive federal funds for adoption and foster-care services to declare overtly, without fear of adverse governmental action, that, based on their religious beliefs, they limit adoption and foster-care-placement opportunities to heterosexual married couples comprising one man and one woman.

43.    Defendants were on notice when they awarded the UC grants for the relevant period to USCCB that USCCB and its subgrantees, including Bethany,

11

would administer the grants in a discriminatory manner based on USCCB's religious beliefs, including its religious beliefs disfavoring LGBTQ people as parents.

44.     Defendants failed to implement adequate safeguards to prevent USCCB and its subgrantees, including Bethany, from administering the UC grants in a discriminatory manner based on USCCB's religious beliefs.

45.     Defendants have failed to take any corrective action after Kelly notified them that USCCB and its subgrantee had discriminated against her under federal programs administered by Defendants.

46.     Defendants unlawfully use federal taxpayer dollars to finance grants to USCCB to implement the UC Program based on impermissible religious criteria.

47.     Defendants are required to administer grants and cooperative agreements in a manner that ensures that federal funding is expended, and associated federal programs are implemented, in accordance with the constitutional guarantees of equality and liberty, the strictures of the Establishment Clause, and applicable statutory and regulatory requirements, including those prohibiting discrimination.

48.     In furtherance of both constitutional requirements and national agency policy, HHS regulations require that no person otherwise eligible be excluded from participation in, denied the benefits of, or subjected to discrimination in the administration of HHS programs and services based on non-merit-based factors such as sexual orientation, sex, or religion. See 45 C.F.R. § 75.300(c) (2016). They further require that the marriages of same-sex couples be treated as valid. See 45 C.F.R. §

75.300(d) (2016). These requirements apply to all HHS grantees and subgrantees, including USCCB and its subgrantees.

*Kelly Easter Seeks to Foster an Unaccompanied Refugee Child*

49.     Kelly Easter was raised in Knoxville, Tennessee. For nearly a decade, Kelly has worked as a realtor serving the greater Nashville area. She is a Christian woman who lives alone in a two-bedroom home in a East Nashville neighborhood.

50.     Kelly's experiences with children of close friends and family sparked her interest in fostering an unaccompanied refugee child. She has completed training courses to become a foster parent and intends to convert the spare bedroom in her home into a child's bedroom upon acceptance as a foster parent.

51.     Kelly was struck by news coverage of the plight of refugee children arriving unaccompanied in the United States. She thus sought information from ORR about the foster-care programs on ORR's website. On or about August 2020, she submitted an e-mail inquiry and received an e-mail less than one month later informing her that her contact information had been forwarded to USCCB. The e-mail included a link directing her to foster-care programs in her area. The USCCB affiliate in Tennessee is Bethany Christian Services.

52.     On or about September 1, 2020, Kelly called Bethany and left a voice message expressing interest in the unaccompanied-minor foster program. Shortly thereafter, she received a call from a recruitment and training coordinator at Bethany. The coordinator encouraged Kelly to join a transitional fostering orientation to be held by Zoom videoconference.

53.     The Bethany representative sent Kelly two follow-up e-mails. The first thanked Kelly for her "heart to serve children in need," and expressed that it was "wonderful speaking with you on the phone!" The e-mail also included the Zoom link, with a note that she would "[s]ee you tomorrow on Zoom!" The second follow-up e-mail, sent the morning after the telephone call, reiterated that it was "great speaking with you yesterday!" and reminded Kelly of the virtual orientation and Zoom link. The e-mail signature of the Bethany representative featured the organization's contact information and a quote: "Every kid is one caring adult away from being a success story."

54.     After speaking with the Bethany representative, however, Kelly grew concerned that she would be prevented from fostering a child through the program because she is a lesbian, and so she began to further research the organization. Because the UC Program was a government program, Kelly did not think that Bethany could lawfully discriminate against her. As she did more research, however, she learned that Bethany had a policy of refusing to work with LGBTQ people. Kelly replied to the representative's e-mail: "After we hung up, I was so inspired and emotional yesterday at the thought that I might be able to help one or more of the children in your care," she wrote. She underscored how eager she was to foster but expressed deep concern that a gay person—even a Christian gay person—would not be allowed to participate in the program. "I was really hurt to discover this … honestly, I was heartbroken," Kelly wrote. She then asked if there might be an exception to the policy because the program is federally funded.

55.     Kelly did not hear back from Bethany for more than two weeks.

56.     On September 21, 2020, Kelly sent a follow-up e-mail reaffirming her interest in participating in the foster-care program.

57.     Shortly after that, Kelly received a call from the Bethany representative. The representative confirmed the concerns that Kelly expressed in her e-mail and stated that Kelly could not participate in the ORR's unaccompanied-minor programs because she is gay. Bethany is bound by USCCB policy, the representative said, so Kelly would not be able to move forward in the process.

58.     On January 22, 2021, Kelly sent an email to two general ORR e-mail addresses, reporting that Bethany had discriminated against her by declining to permit her to foster an unaccompanied refugee child because she is gay. Kelly's e-mail asked whether that discrimination by a recipient of federal funding was permissible. She did not receive a response to her e-mail until February 7, 2021, when ORR e-mailed Kelly, asking her to reaffirm her continued interest in participating in the foster program and stating that they were "looking into this."

59.     On February 9, 2021, Kelly sent an e-mail to ORR reaffirming her continued interest in participating in the program.

60.     She received an e-mail response on February 11, 2021, thanking her for her patience. She has not received any further communication from ORR since then.

61.     On March 1, 2021, *The New York Times* published an article reporting that Bethany was changing the policy that previously excluded lesbian and gay individuals from participating in their foster programs.

15

62.     Overjoyed at learning of Bethany's changed policy, Kelly sent an e-mail to the Bethany representative a day later, with the article included as an attachment. Kelly asked if the policy change meant that she would now be able to apply for the foster-care program.

63.     The Bethany representative responded the same day, stating that she had read the article and had "immediately reached out to leadership for guidance." Three days later, the representative sent Kelly an e-mail apologizing for the delay and informing Kelly that "[Bethany] and USCCB met this week and are still working through the policy to come up with an agreement."

64.     After not hearing from the Bethany representative for more than a week, Kelly sent a follow-up e-mail on March 15, 2021, requesting an update. Kelly mentioned that she had completed the required training courses for foster parenting.

65.     On March 16, 2021, the Bethany representative again apologized for the delay and said that she had "not been updated on if an agreement ha[d] been made between Bethany and USCCB."

66.     On April 26, 2021, Kelly received an e-mail from the Bethany representative, letting her know that they were finalizing contracts for a new location for their program, and once those were in place, they could "begin recruiting all types of families to serve unaccompanied [refugee] children."

67.     On June 24, 2021, Kelly received another e-mail from the Bethany representative, telling her that Bethany had signed a contract with Lutheran Immigration and Refugee Service ("LIRS"), which would allow Kelly to begin the

16

process of becoming a foster parent with Bethany. She included an application for Kelly to fill out if she was interested and gave Kelly information about upcoming trainings.

68.     Kelly e-mailed back the next day, asking the Bethany representative to clarify whether this new program with LIRS was through the federal programs for refugee children, and whether, if she were licensed through the new program, she would be eligible to foster any children in those federal programs in Nashville regardless of her sexual orientation.

69.     The Bethany representative wrote back on July 2, 2021, confirming that the new program with LIRS works solely with unaccompanied refugee children, and telling Kelly in what would prove to be a deceptively promising way, "The only reason you were not able to move forward with our TFC program in East Nashville is because we are under USCCB. Now we have a new LIRS program that will allow all families to foster refugee children including LGBTQ+ families."

70.     On July 16, 2021, Kelly received an additional e-mail from a different Bethany representative, who introduced herself as the new recruiting and licensing specialist with Bethany's new site opening in September. She provided some additional details of how Bethany's program offers temporary care for unaccompanied minors crossing the border and invited Kelly to submit an application.

71.     Kelly submitted an application to Bethany in or about the beginning of August 2021. She was scheduled for a home-study appointment on August 24.

17

72.     On or about August 12, 2021, Kelly received a call from Bethany, telling her that, because she is LGBTQ, she could not participate in Bethany's program through the East Nashville office near her home but would instead have to be assigned to Bethany's Smyrna office, which is a half hour away from her home. A foster child living with Kelly would need to go to the Bethany's Smyrna office twice a day every weekday, which would require Kelly and the child to be in the car at least two hours a day—something she could not do with her work schedule. When Kelly asked why she could not participate in East Nashville much closer to her home, the Bethany representative explained that USCCB funds the East Nashville office and LIRS funds the Smyrna office.

73.     On August 18, 2021, the Bethany representative e-mailed Kelly to follow up, telling her that there are no alternative transportation options for getting any children in her care to the Smyrna office and that Kelly would have to provide the necessary transportation herself. The Bethany representative said she would be in touch if there were any changes, and that she wished there were more that she could do to make Kelly's participation in the program work.

74.     Because USCCB will not permit Kelly to participate in the UC Program in East Nashville on the basis that she is a lesbian, Kelly has effectively been excluded from participation in the UC Program.

75.     By preventing children under their care and custody from being placed in homes of LGBTQ people based on USCCB's religious beliefs, the Defendants—through USCCB and its subgrantees—not only discriminate against LGBTQ people,

18

but also effectively disregard the non-Catholic identities and beliefs of many of the unaccompanied refugee children for whom they are responsible. This conduct potentially increases those children's alienation and vulnerability, while denying them access to loving homes that could serve them best—all at federal taxpayers' expense.

76.     By preventing children under their care and custody from being placed in homes of LGBTQ people based on USCCB's religious beliefs, the government (through USCCB and its subgrantees) disserves and demeans LGBTQ children for whom they are responsible, stigmatizing them as less deserving and less worthy of respect than other children. The government's actions send them the message that, when they grow up to form families of their own, they and their families are inferior to other families and will not have a right to equal treatment in the provision of government services.

77.     Defendants were on notice at the time that they awarded the UC Program grants for the relevant period to USCCB that USCCB and its subgrantees, including Bethany, would administer the federal program in a discriminatory manner based on USCCB's religious beliefs, including its religious beliefs disfavoring LGBTQ people as parents. Yet Defendants did not implement adequate safeguards to prevent USCCB or its subgrantees, including Bethany, from doing so. As a result, Defendants violated the United States Constitution.

78.     USCCB and its subgrantees used federal funds provided by Defendants to discriminate against Kelly based on USCCB's religious beliefs.

19

79.     Defendants were on notice that USCCB and its subgrantee had turned Kelly away because of her sex and sexual orientation based on USCCB's religious beliefs. Rather than remedy that discrimination, Defendants sanctioned the segregation of LGBTQ prospective foster parents into an alternate program, regardless of whether that program met the needs of and was an appropriate fit for those families. Defendants have thus sanctioned and facilitated continued discrimination against LGBTQ prospective foster parents in further violation of the Constitution.

80.     Additionally, Defendants have sanctioned USCCB's continuing refusal to allow children in its care to be fostered by LGBTQ individuals regardless of whether it would serve the best interest of the child to be placed with an LGBTQ foster parent.

81.     By providing federal funds to USCCB, Defendants have enabled the discrimination by USCCB and its subgrantee against Kelly Easter, who has been denied the opportunity to foster a child under the UC Program in Nashville based on impermissible religious considerations.

**CLAIMS FOR RELIEF**
**Count I**
**(First Amendment – Establishment Clause)**
**U.S. Const. amend I**

82.     Plaintiffs reincorporate the foregoing allegations as if fully set forth here.

83.     The Establishment Clause of the First Amendment to the United States Constitution forbids the government from favoring one religion over another, or religion over nonreligion.

84.     In violation of the Establishment Clause, Defendants have delegated to USCCB and its subgrantees the responsibility for providing foster-care services to children in federal custody, including the tasks of recruiting, screening, and training prospective foster parents, while authorizing and allowing the organizations to perform those functions in a religiously discriminatory manner.

85.     Also in violation of the Establishment Clause, Defendants have provided and continue to provide federal funds to USCCB and its subgrantees, which discriminate based on religion in recruiting and training foster parents and in determining foster-care placements for refugee children entrusted to the ORR's care.

86.     Defendants have also violated the Establishment Clause of the First Amendment because, among other reasons, Defendants' actions, policies, practices, and procedures regarding the UC Program:

a)      have the primary purpose of favoring, preferring, and endorsing certain religious beliefs and certain religious denominations over others and over nonreligion;

b)      have the primary effect of favoring, preferring, and endorsing certain religious beliefs and certain religious denominations over others and over nonreligion;

21

c)      have the purpose of preferring the religious beliefs of some people and institutions over the religious beliefs and fundamental rights of others;

d)      have the effect of preferring the religious beliefs of some people and institutions over the religious beliefs and fundamental rights of others;

e)      endorse the religious beliefs of faith-based child-welfare organizations;

f)      entangle government with religion;

g)      are not neutral among religious denominations and beliefs or between religion and nonreligion;

h)      delegate governmental authority to child-placement organizations such that the agencies can and do create religious requirements for gaining access to or participating in governmental programs, services, and resources;

i)      cede control over governmental decisions and actions to a religious organization that can, and in fact does, make decisions and take actions in accordance with and in service of its religious beliefs;

j)      fund child-placement organizations with federal taxpayer money that the organizations put to religious and discriminatory uses;

k)      make third parties—such as Kelly Easter, other prospective foster parents, and children in foster care—bear the costs, harms, and burdens of faith-based child-placement organizations' religious beliefs and religious practices;

l)    coerce prospective foster parents to affirm and adhere to the specific religious beliefs of faith-based child-placement organizations in order to become a foster parent and thereby participate in or partake of government-funded services through the organization; and

m)    permit USCCB and its subgrantees to coerce vulnerable and impressionable children in ORR's care that have been assigned to faith-based child-placement organizations into believing and practicing the organizations' preferred faiths, without regard to the children's or their biological parents' own faiths.

87.    Through the actions described above, Defendants have violated the Establishment Clause of the First Amendment to the United States Constitution. As a result, Kelly has been injured and is entitled to relief.

## Count II
## (Fifth Amendment – Equal Protection)
## U.S. Const. amend V

88.    Plaintiff reincorporates the foregoing allegations as if fully set forth here.

89.    The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the federal government from denying equal protection of the laws.

90.    Defendants have discriminated and continue to discriminate impermissibly against individuals, including Kelly, based on religion, sexual orientation, and sex, by funding the administration of services that they are on notice are being administered in a manner that disfavors and excludes LGBTQ people.

23

91.     Defendants have deprived and continue to deprive individuals, including Kelly, of equal dignity, liberty, and autonomy, and brand them as inferior by discriminating against them based on religion, sexual orientation, and sex.

92.     Discrimination based on religion, sexual orientation and sex is presumptively unconstitutional and subject to heightened scrutiny.

93.     There is no constitutionally adequate justification for Defendants' actions.

94.     Defendants' actions fail to advance even any legitimate governmental interest, let alone the exceedingly persuasive one required. On the contrary, allowing and enabling use of religious criteria for participation in a federal program to care for children in the legal custody and care of the government is antithetical to Defendants' responsibility to ensure that the best interests of the children drive their placement.

95.     Defendants' actions harm LGBTQ people who wish to become foster parents, including Kelly.

96.     Defendants' actions harm children in the government's custody who are awaiting placement with a foster parent and are either denied placement with a foster parent or delayed in being placed with a foster parent because Defendants' actions permit qualified and capable foster parents who would provide a nurturing home to be denied the opportunity to be foster parents.

97.     Through the actions described above, Defendants have deprived and continue to deprive Kelly of her rights protected by the equal protection guarantee of the Fifth Amendment to the United States Constitution.

24

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court grant the following relief:

A.     Enter a declaratory judgment that Defendants' failure to ensure that Kelly may apply to be a foster parent to a child under the UC Program through Defendants' grantee USCCB without consideration of religious or other criteria that disfavor her based on her sexual orientation or sex violates the First and Fifth Amendments to the United States Constitution.

B.     Enter a declaratory judgment that Defendants' actions in enabling, sanctioning, ratifying, or failing to implement adequate safeguards against the use of religious or other criteria disfavoring LGBTQ people to determine who may participate in the UC Program violates the First and Fifth Amendments to the United States Constitution.

C.     Issue a permanent injunction requiring Defendants to ensure that Kelly and other LGBTQ persons may become a foster parent to a child under the UC Program on equal terms relative to non-gay applicants and to give equal and fair consideration to Kelly's application and the applications of other LGBTQ persons without consideration of religious or other criteria that disfavor her based on her sexual orientation and sex.

D.     Issue a permanent injunction prohibiting Defendants in the administration of the UC Program from enabling, sanctioning, ratifying, or failing to implement adequate safeguards against the use of religious or other criteria to

exclude or discourage foster parent applicants based on their sexual orientation and sex, including, if necessary to achieve those ends, prohibiting Defendants from awarding UC grants to USCCB.

E.      Award Plaintiff her reasonable costs and attorney's fees.

F.      Grant any other and further relief that this Court may deem fit and proper.

Dated: October 13, 2021

Respectfully submitted,



ORRICK, HERRINGTON & SUTCLIFFE LLP



By: /s/ Andrew D. Silverman
Andrew D. Silverman (DC Bar No. 1013835)
Daniel A. Rubens (*pro hac vice* admission pending)
51 West 52nd Street
New York, NY 10019-6142
(212) 506-5000
asilverman@orrick.com
drubens@orrick.com

Seth Harrington (*pro hac vice* admission pending)
222 Berkeley Street
Suite 2000
Boston, MA 02116
(617) 880-1800
sharrington@orrick.com

and

\* Camilla B. Taylor
**LAMBDA LEGAL DEFENSE AND**
**EDUCATION FUND, INC.**
105 West Adams, 26th Floor
Chicago, IL 60603-6208
Telephone: (312) 663-4413
ctaylor@lambdalegal.org

\* Karen L. Loewy
**LAMBDA LEGAL DEFENSE AND**
**EDUCATION FUND, INC.**
1776 K Street N.W., 8th Floor
Washington, DC 20006-2304
Telephone: (202) 804-6245
kloewy@lambdalegal.org

M. Currey Cook (*pro hac vice* admission pending)
**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**
120 Wall Street, 19th Floor
New York, NY 10005-3919
Telephone (212_ 809-8585
ccook@lambdalegal.org

and

Richard B. Katskee (DC Bar No. 474250)
Kenneth D. Upton, Jr. (DC Bar No. 474250)
**AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE**
1310 L Street NW, Suite 200
Washington, DC 20005
Tel: (202) 466-3234
Fax: (202) 466-3353
*katskee@au.org*
*upton@au.org*

*Attorneys for Plaintiff*

*\*admission to the bar of the Court pending*